## No. 23867.

THE PEOPLE OF THE STATE OF COLORADO EX REL., JOHN P. ORCUTT, COMMISSIONER OF AGRICULTURE *v.* INSTANTWHIP DENVER, INC., A CORPORATION.
(490 P.2d 940)

Decided November 22, 1971.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, Robert C. Miller, Assistant, James K. Kreutz, Assistant, for plaintiff in error.

Walter F. Scherer, Clarke W. Karr, for defendant in error.

En Banc.

Mr. Justice Lee delivered the opinion of the Court.

This writ of error is directed to a judgment of the Denver District Court denying plaintiff's application for a permanent injunction restraining defendant, Instant-whip Denver, Inc., from selling or offering for sale within the state of Colorado "Instantwhip's Dressing," "Jim's Dressing," and "Dressing," food products manufactured by defendant and sold at wholesale to restaurants and institutions such as hospitals. The complaint alleges that the above food products are "filled dairy products," the manufacture and sale of which within the state of Colorado is prohibited by C.R.S. 1963, 7-6-25 to 7-6-32, known as The Colorado Filled Dairy Products Act. Section 25(2)(a) of the act defines a filled dairy product as follows:

" 'Filled dairy product' means any milk, cream or skimmed milk, or any combination thereof, whether or not condensed, evaporated, concentrated, frozen, powdered, dried, or dessicated, or any food product made or manufactured therefrom, to which has been added, or which has been blended or compounded with any fat or oil other than milk fat so that the resulting product is in imitation or semblance of any dairy product, including but not limited to milk, cream, sour cream, * * * ."

The act forbids the manufacture, sale and possession of

filled dairy products and empowers the department ·of agriculture and the commissioner of agriculture to enforce the act, authorizes injunctive proceedings, and provides for seizure and disposition of filled dairy products illegally held. The People through the commissioner of agriculture sought to enjoin the further sale of defendant's products and sought to seize and destroy the products in defendant's possession which were then held for sale.

The trial court entered extensive findings of fact and conclusions of law, and denied all relief. We affirm the judgment.

In summary, the findings reflect that "Instantwhip's Dressing," "Jim's Dressing" and "Dressing" were all manufactured by the same process and contained the same basic ingredients — water, hydrogenated vegetable oil, nonfat dry milk, lactic culture, mono di glycerides, Irish moss and salt. The trade names and ingredients were properly set forth on the labels of the containers in which the products were sold. The products were sold to and used by consumer restaurants and institutions as substitutes for sour cream, as a topping for baked potatoes, and for use in sauces, salad dressings and gravies. They were similar in color, body, texture, odor and flavor to sour cream. Instantwhip's dressings had a usable life of approximately eight weeks, whereas the usable life of sour cream is approximately two and one-half weeks because of a more rapid whey separation.

The process used in manufacturing defendant's products was essentially the same as used in producing sour cream. With one exception the ingredients were the same: milk fat is used in making sour cream, whereas vegetable fat is used in producing the Instantwhip dressings.

The court further found that defendant's products compete not only with sour cream but also with other commercially manufactured substitute sour cream mixes which do not contain dry milk, but which use instead

commercially made lactic acid; that defendant could make its product with commercially made lactic acid rather than dry milk; but that defendant claims natural acidification with milk produces a better taste than that produced by the artificial acidification process. In its conclusions, the court observed that by using commercially made lactic acid the defendant could lawfully manufacture and sell its product, as did its competitors who did not use dry milk in their products. (The product would not then come within the filled milk act.)

The court found the ingredients used in defendant's dressings were wholesome and healthful, and the dressings were manufactured in compliance with local and federal health standards. Nutritionally, the only apparent difference between sour cream and defendant's dressings was that sour cream contained vitamin A from its milk fat content, whereas the vegetable fat used in defendant's dressings contained no vitamin A.

Further, the court found that defendant's products were directly sold to restaurants and hospitals and not to grocery markets; that the restaurants which used the products did not advertise sour cream on their menus; that for the most part the product was placed on the customer's table as a topping for potatoes; and in one restaurant where customers requested sour cream, defendant's dressing was served to the customers.

The court concluded there was no fraud being perpetrated by defendant in the sale to the restaurants and hospitals, as the products were clearly labeled as to their contents; the buyers were advised that the product was a dressing that might be used in place of sour cream, mayonnaise or other similar products; and that the buyers knew what they were buying. In only one instance was there any showing that patrons of a restaurant were deceived as to the nature of the product. The court concluded that the consequence for this deception should be borne by the restaurant and not the defendant manufacturer.

The court concluded the Instantwhip products were in fact "in imitation or semblance" of sour cream and were therefore "filled dairy products" as defined by the act. However, the court ruled the statute had no relation to the public health, safety and welfare and was an invalid exercise of the police power and therefore unconstitutional as applied to defendant's products. The court further concluded that no fraud was being perpetrated upon the public by the defendant that would justify restraining the defendant from selling its products.

The findings of the trial court were amply supported by the evidence, which the record shows for the most part to be undisputed.

Historically, legislation banning filled milk was first enacted by congress on March 14, 1923. The Federal Filled Milk Act, 21 U.S.C. 61 et seq., prohibited the shipment in interstate commerce of any filled milk. Subsequently, many states adopted similar legislation which forbade the manufacture and sale of filled milk.

In United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234, the Federal Filled Milk Act was sustained against an attack of unconstitutionality as an infringement upon the Fifth Amendment rights of due process of law. The act was sustained on the basis of the legislative history and on congressional findings that filled milk products were nutritionally deficient and resulted in deceptive marketing practices amounting to consumer fraud.

Again in 1944 the act was held to be valid as against the attack that it violated due process of law where the filled milk product involved was admittedly wholesome. Carolene Products Co. v. United States, 323 U.S. 18, 65 S.Ct. 1, 89 L.Ed. 15. The court held that even though the problem of nutritional deficiencies had been overcome, the evil of product confusion remained and congress could validly exclude filled milk compounds from interstate commerce.

Simultaneously, the court announced *Sage Stores v. Kansas*, 323 U.S. 32, 65 S.Ct. 9, 89 L.Ed. 25, where the Kansas Filled Milk Act was held not to be in violation of the rights of liberty and property under the due process of law and equal protection clauses of the Fourteenth Amendment. The court decided that the particular product under consideration, although wholesome, was less nutritious than evaporated whole milk and, even though properly labeled, the legislative purpose of preventing fraud and deception was a rational basis upon which to justify prohibition of its manufacture and sale.

Following the federal precedents, state acts were upheld in the exercise of the police power in the following jurisdictions: *Aeration Processes v. Commissioner of Public Health*, 346 Mass. 546, 194 N.E.2d 838; *Poole and C. Market Co. v. Breshears*, 343 Mo. 1133, 125 S.W.2d 23; *Carolene Products Co. v. Harter*, 329 Pa. 49, 197 A. 627, 119 A.L.R. 235; *Martin v. Wholesome Dairy, Inc.*, 437 S.W.2d 586 (Tex. Civ. App.); *Reesman v. State*, 74 Wash. 2d 646, 445 P.2d 1004.

In our opinion, however, more persuasive holdings to the contrary are found in the following decisions where the respective acts were found to be unconstitutional in some or all aspects considered: *State v. A. J. Bayless Markets, Inc.*, 86 Ariz. 193, 342 P.2d 1088; *People v. Carolene Products Co.*, 345 Ill. 166, 177 N.E. 698; *Carolene Products Co. v. McLaughlin*, 365 Ill. 62, 5 N.E.2d 447; *Coffee-Rich, Inc. v. Commissioner of Public Health*, 348 Mass. 414, 204 N.E.2d 281; *Carolene Products Co. v. Thomson*, 276 Mich. 172, 267 N.W. 608; *Carolene Products Co. v. Banning*, 131 Neb. 429, 268 N.W. 313.

██ It has many times been said, in a variety of ways, that statutes are presumed to be constitutional and are not to be overthrown as unconstitutional unless shown by clear and convincing considerations to be so beyond a reasonable doubt. *Morgan Co. Jr. College v. Jolly*, 168 Colo. 466, 452 P.2d 34; *Mosko v. Dunbar*, 135 Colo. 172, 309 P.2d 581; *Eachus v. People*, 124 Colo. 454,

238 P.2d 885. Also, that in the exercise of the police powers, legislative regulations, restraints and proscriptions must bear a reasonable relation to the public health, safety, morals and welfare and have a real and substantial relation to the accomplishment of the objectives which form the basis of the police regulation. *Love v. Bell*, 171 Colo. 27, 465 P.2d 118; *Denver v. Thrailkill*, 125 Colo. 488, 244 P.2d 1074.

Those states which have held the filled milk acts to be unconstitutional, while recognizing the undoubted authority to regulate business in the interests of the public health, safety, morals, general welfare, and in the interest of preventing fraud, have predicated statutory invalidity on the absence of a reasonable relationship between the public purpose to be protected or conserved, or the public wrong to be corrected, and the remedy adopted by the legislature — that of complete prohibition of the manufacture or sale of the filled milk products.

The avowed purposes of the filled milk acts, as enunciated in various cases decided, is to protect public health and to prevent fraud in sales. Those courts which held such acts to be invalid found that the total prohibition of the manufacture and sale of admittedly nutritious, wholesome and healthful products bore no reasonable relationship to the purported object of the statute, that of protecting public health; and, that when the product was clearly and distinctively labeled, with its ingredients fully and correctly set forth, and the methods by which it was marketed were free from misrepresentation, the prohibition of its manufacture and sale was not reasonably related to the second statutory objective, that of protecting against consumer fraud. The Michigan court in *Carolene Products Co. v. Thomson, supra,* stated:

"The power of the legislature to regulate the product and sale of milk and its derivatives cannot be doubted. But the police power of regulation does not include the absolute prohibition of trade in useful and harmless ar-

ticles of commerce. Being prohibitory, the act must·be declared to be invalid."

Speaking to the prevention of fraud, the same court stated that the possibility of wrong to the public does not always justify prohibition of the business and that regulation only may be the reasonable remedy.

"Even if they actually deceive, a few casual and individual deceptive offers of a product would not constitute public fraud and, therefore, would not afford such reasonable relation between a public wrong and the remedy as to justify absolute prohibition of sale of the product. If it were otherwise, the police power over the constitutional right to do business would be without practical limit as the possibility of misrepresentation exists in the sale of any article." *Carolene Products Co. v. Thomson, supra.*

In *Carolene Products Co. v. Banning, supra,* where the product was admittedly wholesome and healthful, the Nebraska court speaking with reference to the fraud problem stated:

"* * * We cannot say that a few instances of deception on the part of retailers are sufficient to give authority to the legislature under the police power to prohibit the sale of a product. To so hold would give the legislature power to prohibit the sale of any article on the market, as all are subject to the possibility of being misrepresented. If retailers of a wholesome and nutritious food product practice deception in its sale, the remedy is by regulation and not by destruction of the business. * * *"

The Arizona Supreme Court held to the same effect in *State v. A. J. Bayless, supra.*

In *Coffee-Rich, Inc. v. Commissioner of Public Health, supra,* the Supreme Judicial Court of Massachusetts, although having previously held its statute to be constitutional. generally, held it unconstitutional as to the retail sale of Coffee-Rich, an additive held to be in imitation or semblance of cream. It stated:

"* * * Since this product is admittedly wholesome, there

is nothing to justify an embargo of it on the basis of protecting the public health or safety. * * *"

The court spoke of the fraud aspect of the statute as applied to this product, as follows:

"The defendants contend, however, that the 'reasonabↄeness' of totally prohibiting the sale of Coffee-Rich to prevent 'fraud, deception and confusion becomes abundantly clear from a consideration of the possible uses of this product.' They argue that '[a]lthough * * * the * * * product is at present sold only in retail markets * * *, there is no adequate means of preventing a common victualer or other institutional user from purchasing large quantities of "Coffee-Rich" and selling it under the guise of cream.' But whatever the consequences of such possible fraudulent action, they need not be visited on the manufacturer who makes a wholesome product and in no way misleads any reasonable person as to its nature. * * *" *Coffee-Rich, Inc. v. Commissioner of Public Health, supra.*

The Colorado Filled Milk Act contains no recitations of its purpose. C.R.S. 1963, 7-6-25, *et seq.* Nor does it declare filled milk products to be injurious or harmful to the public. We presume in the absence of such declared objectives that the purposes of the proscription are those announced in other jurisdictions as declared by judicial decision. Clearly, if the object is purely economic, to protect the dairy industry from competition from another segment of the food industry, the act would be unconstitutional as suggested in *Carolene Products Co. v. United States,* 323 U.S. 18, 65 S.Ct. 1, 89 L.Ed. 15. *See also: People v. Marx,* 99 N.Y. 377, 2 N.E. 29; *John F. Jelke Co. v. Emery,* 193 Wis. 311, 214 N.W. 369.

■ The People essentially base their contention of validity on the proposition that, when there is a possibility of consumer confusion, fraud and deception, the state may constitutionally totally prohibit the manufacture and sale of the product as a reasonable means of protecting the public under the police power, and need

not rely upon regulatory measures alone. *Hebe v. Shaw,* 248 U.S. 297, 39 S.Ct. 125, 63 L.Ed. 255, and *Sage Stores v. Kansas, supra,* support this proposition from the standpoint of the Federal Constitution. However, we are not bound to interpret the due process clause of the Constitution of Colorado, art. II, § 25, so narrowly. As stated in *Coffee-Rich, Inc. v. Commissioner of Public Health, supra,*

"* * * What is permissible under the Federal Constitution in matters of State economic regulation is not necessarily permissible under State law. The Constitution of a State may guard more jealously against the exercise of the State's police power. See Minnesota v. National Tea Co., 309 U.S. 551, 60 S.Ct. 676, 84 L.Ed. 920. Cf. Pugliese v. Commonwealth, 335 Mass. 471, 475, 140 N.E.2d 476. Accordingly, the Federal cases to which we have referred do not here compel a like result. We need not follow them since we decide this case in light of our State Constitution, * * *."

We do not choose to hold as valid under the Colorado constitution so broad an exercise of the police power. We, therefore, hold that the total prohibition of the manufacture, sale or possession of a nutritious, wholesome and healthful food product, clearly and distinctively labeled, with its ingredients fully and correctly disclosed, and where marketed in a manner free from misrepresentation, is in excess of the police power of the state and must be declared invalid under the due process clause of the Constitution of Colorado, art. II, § 25.

We do not say that in a case where such a product is shown to be harmful or injurious to health, or where there are labeling insufficiencies or fraudulent marketing methods, the statute may not be operative as a valid exercise of the police power. A statute may be held constitutionally invalid as applied when it operates to deprive one of a protected right, although its general validity as a measure enacted in the legitimate exercise of the state police power may be beyond question. *Boddie*

*v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). This principle is applicable to the present case under the facts as found by the trial court and the denial of the injunctive relief was proper.

The judgment is affirmed.