No. 54,466

Dr. Chester H. Strehlow and Mary L. Strehlow, *Appellees,* v. Kansas State Board of Agriculture, *Appellant.*

(659 P.2d 785)

Opinion filed January 14, 1983.

*Kenneth M. Wilke,* chief counsel for the Kansas State Board of Agriculture, of Topeka, argued the cause and was on the brief for appellant.

*James P. Nordstrom,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause and was on the brief for appellees.

*James R. Hanson,* of Boyer, Donaldson & Stewart, of Wichita, was on the brief for *amici curiae* Associated Milk Producers, Inc. and Mid-America Dairymen, Inc.

The opinion of the court was delivered by

Holmes, J.: This is an appeal by the defendant, Kansas State Board of Agriculture (KSBA or the Board) from an order of the district court holding the provisions of the Kansas filled dairy products act (FDPA), K.S.A. 65-725 *et seq.* unconstitutional as applied to a product marketed by the plaintiffs. The facts are not in dispute and will be greatly summarized herein.

The plaintiffs, Dr. Chester H. Strehlow, and his wife, Mary L. Strehlow, are co-zone directors for Meadow Fresh Farms, Inc., a foreign corporation, in the sale and distribution of the corporation's "Imitation Lowfat Dry Milk" (Imitation) within the State of Kansas. Imitation contains, among other ingredients, partially hydrogenated coconut oil, whey (a milk by-product) and nonfat milk and is therefore a filled dairy product within the definition and meaning of the FDPA. As such, its sale in Kansas is prohibited. Imitation is a wholesome, nutritious, healthful and non-

deleterious drink whose ingredients are generally recognized as safe by the United States Food and Drug Administration and which are also found in numerous other products readily available for human consumption, such as non-dairy creamers, imitation ice cream, cocoa mixes and salad dressings. The KSBA, in enforcing the provisions of K.S.A. 65-725 *et seq.,* has ordered that Imitation not be sold in the State of Kansas. Following the issuance of the Board's order on September 30, 1981, plaintiffs filed a petition in Shawnee District Court for a declaratory judgment that the FDPA was unconstitutional and a determination that it could not be enforced against the plaintiffs in their efforts to sell and market Imitation. As there were no controverted issues of fact, the trial court sustained plaintiffs' motion for summary judgment, held that the FDPA, as applied to Imitation, was unconstitutional and enjoined the Board from enforcing the act against the plaintiffs and the sale and marketing of Imitation in Kansas. The Board has appealed.

The purposes of the FDPA are set forth by the Legislature in K.S.A. 65-726, which reads:

"Filled dairy products resemble genuine dairy products so closely that they lend themselves readily to substitution for or confusion with such dairy products and in many cases cannot be distinguished from genuine dairy products by the ordinary consumer. The manufacture, sale, exchange or offering for sale or exchange of filled dairy products creates a condition conducive to substitution, confusion, deception, and fraud, and one which if permitted to exist tends to interfere with the orderly and fair marketing [of] foods essential to the well-being of the people of this state. It is hereby declared to be the purpose of this act to correct and eliminate the condition above referred to; to protect the public from confusion, fraud, and deception; to prohibit practices inimical to the general welfare; and to promote the orderly and fair marketing of essential foods."

### K.S.A. 65-727(*b*) provides:

"(*b*) The term 'filled dairy product' means any milk, cream or skimmed milk or any combination thereof, whether or not condensed, evaporated, concentrated, frozen, powdered, dried or desiccated, or any food product made or manufactured therefrom, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, or any solids other than milk solids, except sweeteners, stabilizers and flavorings, so that the resulting product is in imitation or semblance of any dairy product, including but not limited to, milk, sour cream, butter cream, skimmed milk, ice cream, ice milk, whipped cream, flavored milk or skim milk drink, dried or powdered milk, cheese, cream cottage cheese, ice cream mix, sherbet, condensed milk, evaporated milk, or concentrated milk: *Provided, however,* That this term shall not be construed to mean or include: (1) Any distinctive proprietary food compound not readily mistaken for a dairy product,

when such compound is customarily used on the order of a physician and is prepared and designed for medicinal or special dietary use and prominently so labeled; (2) any dairy product flavored with chocolate or cocoa, or the vitamin content of which has been increased, or both, where the fats or oils other than milk fat contained in such product do not exceed the amount of cocoa fat naturally present in the chocolate or cocoa used and the food oil, not in excess of one-hundredth of one percent of the weight of the finished product used as a carrier of such vitamins; or (3) oleomargarine, when offered for sale and sold as and for oleomargarine."

K.S.A. 65-728 makes it unlawful for any person to manufacture, sell, exchange, or offer for sale or exchange any filled dairy product while 65-729 provides that any violation of the FDPA may be punished by a fine not to exceed five hundred dollars ($500.00) or by imprisonment not to exceed one year or by both fine and imprisonment.

The trial court in its conclusions found that Imitation contains coconut oil, whey and nonfat dry milk among its ingredients, does not fall within any of the three exceptions set forth in K.S.A. 65-727(*b*), is a filled dairy product within the terms of the act and that its sale is prohibited by the statutes. The court also made the following conclusions of law:

"5. The FDPA in K.S.A. 65-727(b) lists several filled dairy products which are exempt from coverage. For example, the sale of oleomargarine, filled products used on order of a physician, and certain chocolate flavored products are allowed to be sold in Kansas. The pertinent exemption in the present case is K.S.A. 65-727(b)(2), the chocolate product exemption. Under the FDPA, Imitation is a filled product whose sale is prohibited. Yet, when chocolate flavoring is added to this product, it falls within K.S.A. 65-727(b)(2) and its sale becomes permissible. K.S.A. 65-727(b)(2) has the effect of creating two economic classes: the manufacturers and sellers of 'white' filled milk and the manufacturers and sellers of 'chocolate' filled milk. Plaintiffs in the instant case fall within the white seller and producer classification. Plaintiff contends, and this Court agrees, that this classification denies plaintiff equal protection of the law.

.   .   .   .   .

"7. There is no question that the interests sought to be protected by the FDPA are legitimate state interests. The only question is whether the classifications created by K.S.A. 65-727(b)(2) are based on distinguishing factors rationally related to the stated purposes of FDPA. It is this Court's opinion the classifications, white filled milk and chocolate filled milk, are not based on differences rationally related to protecting public health or preventing deceptive sales. No facts can reasonably be conceived to support the position that Imitation becomes more nutritious merely with the addition of chocolate. Nor does the mere fact a product is chocolate flavored make it less likely a consumer will be deceived into believing he is purchasing a non-filled product. While it is possible the addition

of chocolate might put a consumer on notice that the product is not 100% natural, it does nothing to warn the consumer he is purchasing a filled product.

"8. Classifications based on the presence or absence of chocolate as an ingredient are not rationally related to the stated purposes of the FDPA. Such classifications are arbitrary and violate plaintiff's equal protection. Accordingly, the Court finds that the FDPA as applied to Imitation is unconstitutional and grants plaintiffs' motion for an injunction prohibiting the enforcement of the FDPA by the defendant against the plaintiffs. The Court's conclusion is supported by the following cases where it was found that similar Filled Milk Acts were violative of the equal protection clause: *Milnot Company v. Douglas,* 452 F. Supp. 505 (SD West Virg. 1978); *Milnot Company v. Arkansas State Board of Health,* 388 F. Supp. 901 (E.D. Ark. 1975); *Milnot Company v. Richardson,* 350 F. Supp. 221 (S.D. Ill. 1972)."

It is obvious that the trial court's statements to the effect that the addition of chocolate flavoring to a filled dairy product would bring it within the exemptions of K.S.A. 65-727(*b*)(2) are erroneous. The exception only applies to the addition of chocolate flavoring to a *dairy product* which then results in the original product becoming a *filled dairy product.* The addition of chocolate flavoring to a filled dairy product such as Imitation does not bring that product within the exception and change the original prohibited filled dairy product into an excepted or legal dairy product. Imitation with chocolate flavoring added would still contain the other ingredients such as coconut oil and would continue to be prohibited under the statutes. Thus it appears that the chocolate flavoring exception is in the first instance an exception to the filled milk statute, K.S.A. 65-707(E)(2), in that it allows the addition of a substance containing fat or oil other than milk fat to a pure dairy product, which is precluded by 65-707(E)(2). As the addition of the chocolate flavoring to a pure dairy product results in a filled dairy product, the exception then precludes the operation of 65-728 which makes it illegal to create, sell, etc., a filled dairy product.

The fact that the trial court made certain erroneous conclusions of law does not necessarily require a reversal of its judgment that the FDPA as applied to Imitation is unconstitutional as a violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. If the trial court reached the correct result, but for the wrong reason, the decision should still be upheld. *Farmers State Bank v. Cooper,* 227 Kan. 547, Syl. ¶ 10, 608 P.2d 929 (1980).

It is obvious from the stated purposes of the legislation, K.S.A. 65-726, that the FDPA was enacted to protect the public from

fraud and deception in the marketing of products which may be confused with so-called pure dairy products and to promote the general welfare by encouraging the marketing of pure dairy products. One nonstated objective may be the economic protectionist aspect of the act which many consider as legislation to promote and protect the dairy industry. The fact that the industry does have an economic interest in the preservation of the restrictions imposed by the FDPA is borne out by the filing of an *amici* brief by Associated Milk Producers, Inc., and Mid-America Dairymen, Inc., cooperative marketing associations formed to market the milk and milk products of their member producers.

At this point we pause to direct the reader's attention to Appendix "A" to this opinion which is a reproduction of the actual labeling used in the packaging and marketing of Imitation. An examination of this exhibit may be helpful in understanding the arguments of the parties. As will be seen, the label clearly reflects that the product is called Imitation Lowfat Dry Milk even though it contains some dairy products.

The defendant-appellant takes the position that Imitation violates the letter of the law and therefore its sale in Kansas must be prohibited regardless of the quality of the product involved. It further argues that if there is any rational or reasonable basis for the classification contained in the FDPA then it is the duty of this court to uphold the constitutionality of the statutes as against due process and equal protection attacks. In *Manhattan Buildings, Inc. v. Hurley,* 231 Kan. 20, 643 P.2d 87 (1982), we reviewed at some length the application of the reasonable basis test and we need not repeat what was said there. We recognize the proper test and it merely remains for this court to determine if there is any reasonable basis, based upon the legislative purpose as set forth in the statute, to ban the sale of Imitation. The Board states in its brief "[a]t the time the FDPA was enacted, the purpose behind the legislation was to prevent consumer deception in the marketplace due to the possibility of a filled dairy product being purchased for a specific dairy product and used in place of said dairy product." What may have been valid reasons for the adoption of the filled milk act in 1923 and the FDPA in 1953 may not be controlling in 1983. The Board also argues that if there is any debatable issue as to the reasonableness of the FDPA, then it is for the legislature and not the courts to decide that issue. It also

appears to be the argument of the Board that as the original Kansas filled milk act has been previously held constitutional by this court and the United States Supreme Court, such determinations are not now open to question even as to the FDPA and that the earlier decisions are controlling under the doctrine of *stare decisis.* All of the arguments advanced by the Board in support of the acts are considered and discussed at length in the cases hereinafter cited.

The Board does not contest or dispute the allegations of the plaintiffs that their product is wholesome, nutritious, healthful and nondeleterious. On the other hand the plaintiffs do not dispute the fact that their product is in obvious violation of the FDPA. It is the position of the plaintiffs, however, that the exceptions for chocolate or cocoa flavored dairy products and oleomargarine and the broad ban of the FDPA itself and the filled milk act bear no reasonable relationship to the asserted purposes of the acts and therefore result in a denial of plaintiffs' right to due process and equal protection of the laws under the Constitution even though oleomargarine and chocolate milk are not in direct competition with Imitation. To properly consider the positions of the parties, a review of the filled milk laws might be in order.

The Congress of the United States enacted the first federal filled milk act in 1923. Legislative history indicates it was then believed that the butterfat portion of milk was the only source of essential vitamins which were contained in milk and the act was designed to protect the consumer from fraud and confusion which might arise in the sale of imitation dairy products and perhaps also to aid the economic interests of milk producers. After the enactment of the federal act, many states followed suit and enacted their own versions of a filled milk law. The first Kansas enactment, similar to the federal act, was in 1923 and is virtually unchanged today. K.S.A. 65-707(E)(2) provides:

"It shall be unlawful to manufacture, sell, keep for sale, or have in possession with intent to sell or exchange, any milk, cream, skim milk, buttermilk, condensed or evaporated milk, powdered milk, condensed skim milk, or any of the fluid derivatives of any of them to which has been added any fat or oil other than milk fat, either under the name of said products, or articles or the derivatives thereof, or under any fictitious or trade name whatsoever."

The constitutionality of the act was first challenged in *Carolene Products Co. v. Mohler,* 152 Kan. 2, 102 P.2d 1044 (1940).

Plaintiff brought the action to enjoin the Secretary of Agriculture of Kansas and the Diary Commissioner of Kansas from enforcing the above quoted statute against plaintiff's products, which were similar to Imitation, on the grounds the statute violated the due process and equal protection clauses of the State and Federal Constitutions. This court held that the statute was constitutional as a valid exercise of the police power of the state. Finding of fact No. 9 of the trial court, which read:

"That there is a serious disagreement among experts on nutrition as to whether coconut oil is a pure, healthful and nutritious food. That the weight of the evidence does not show that coconut oil is a pure, nutritious and healthful food and not harmful when used as food,"

was found by this court to be supported by the evidence. Plaintiff's products Carolene and Milnut consisted of an evaporated sweet skim milk to which had been added coconut oil and vitamin concentrates. In the opinion this court stated:

"If, on the evidence in the case, there is room for a reasonable difference of opinion as to whether the products outlawed by the statute are attended with evil consequences to the public, either in the health of the people, or through fraud and deception in the purchase and use of the products, the judgment of the legislature as expressed in the statute may not be superseded by the views of this court.

. . . .

"It is clear the statute before us — usually referred to as the 'filled-milk' statute — has a two-fold purpose: (1) Preservation of the public health, and (2) prevention of fraud and deception on the consumers of this state." pp. 8-9.

After reviewing a number of decisions from other states, the court stated:

"The production and distribution of pure milk is a matter of universal concern. The peculiar value of milk as a food for infants and children is a matter of common knowledge. The attempt to palm off milk compounds to the consumer has received the consideration of not only the state, but the federal government. As stated in *U.S. v. Carolene Products Co.,* supra, [304 U.S. 144, 82 L.Ed. 1234, 53 S.Ct. 778] the federal filled-milk act was adopted by congress after committee hearings, in the course of which eminent scientists and health experts testified. (A summary of the committee report is given in a note to that case.) In the *Hebe* case [248 U.S. 297, 63 L.Ed. 255, 39 S.Ct. 125] the United States supreme court declared that 'if the character and effect of the article as intended to be used "be debatable the legislature is entitled to its own judgment. . . .' " The declaration of the police power of the state, as set forth by this court in *State v. Wilson,* supra, [101 Kan. 789, 168 Pac. 679], and other cases, is of the same import. But if the added ingredient is harmless in itself, the legislature may prohibit the manufacture and sale of the adulterated compound on the ground of the fraud and

deception practiced in its sale. On either theory, upon the record before us, the judgment of the trial court must be affirmed. It is so ordered." pp. 17-18.

The next test of the statute came in *State, ex rel., v. Sage Stores Co.,* 157 Kan. 404, 141 P.2d 655 (1943), wherein the attorney general sought to oust Sage Stores Co. and Carolene Products Co. from the sale of the same two filled milk products that were the subject matter in *Carolene Products Co.* except that they now contained cottonseed oil instead of coconut oil. The defendants contended that their products were wholesome and nutritious and not deleterious. The filled milk statute was again attacked on constitutional grounds that there was no rational basis for the ban on the defendants' products. The court appointed a commissioner to take evidence and make findings of fact and conclusions of law. Among the commissioner's findings of fact which were made a part of the court's opinion were:

" 'Defendant's product is wholesome, nutritious and harmless, in the sense that it contains nothing of a toxic nature, but it is inferior to evaporated whole milk in the content of fatty acids, phospholipins, sterols and Vitamins E and K, all of which are essential in human nutrition, with the probable exception of Vitamin E in the diet of infants. In addition, evaporated whole milk contains a superior growth-promoting property, found in butterfat and not in cottonseed oil, essential to the optimum growth of infants.

" 'The deficiencies in defendant's product, as compared to evaporated whole milk, are largely made up from other sources when the product is used as a substitute for whole milk or evaporated whole milk in the diet of adults who consume a varied diet. When defendant's product is used as a substitute for whole milk or evaporated whole milk in the diet of infants and children who do not consume a varied diet, such deficiencies are not made up, and the diet is partially inadequate. Defendant's product does "get into the channels of infant nutrition." ' " pp. 449-450.

The court, in a four to three decision, again upheld the constitutionality of the filled milk act. On *certiorari* to the United States Supreme Court in *Sage Stores Co. v. Kansas,* 323 U.S. 32, 89 L.Ed. 25, 65 S.Ct. 9 (1944), the Supreme Court, after repeating the foregoing facts from our decision (323 U.S. at 35-36), went on to state:

"It was also determined by the commissioner and approved by the court that one purpose of the legislature was the prevention of fraud and deception in the sale of these compounds. *State [ex rel.] v. Sage Stores Co.,* 157 Kan. 404, 412-13 [, 141 P.2d 655].

"As a consequence of this evidence, findings of fact and conclusions of law, the rational basis for the action of the legislature in prohibiting the sale, or keeping for sale, of the compounds is even more definite and clear than in *Carolene Products Co. v. United States, ante,* p. 18 [, 89 L.Ed. 15, 65 S.Ct. 1, 155 A.L.R. 1371]. Since petitioners' products had the taste, consistency, color and appearance of whole

milk products, we need not consider the validity of the Kansas act as applied to compounds which are readily distinguishable from whole milk compounds." p. 36

Thus, the U.S. Supreme Court decision, as did the Kansas decision, rested heavily on consideration of nutritional inferiority, which is not an issue in the instant case.

While the FDPA, adopted in 1953, has not previously been before this court, much of what was said in the foregoing cases can be argued in support of the present act. It is obvious that the FDPA was an attempt to broaden the provisions of the filled milk act and also a recognition of the mounting pressure to establish certain exceptions, notably for chocolate-flavored dairy products and oleomargarine which were becoming increasingly popular with the public. How these exceptions can be reconciled with the absolute prohibition contained in K.S.A. 65-707(E)(2) has not been presented to and is not an issue before this court at this time. See K.S.A. 65-732 for the limited scope and effect of the FDPA insofar as other dairy laws are concerned.

Following the early federal and state decisions interpreting and applying the various filled milk acts, many courts in recent years have altered their positions due to changed conditions in the food industry. In *Milnot Company v. Richardson,* 350 F. Supp. 221 (S.D. Ill. 1972), the court was faced with the ongoing question of the constitutionality of the federal filled milk act (21 U.S.C. §§ 61-64). The federal act is similar to our original act and prevented the shipment in interstate commerce of any filled milk products. The products in question were the same products which were the subject of litigation in the early Kansas cases above discussed. The court found no problem in reexamining the federal act even though its constitutionality had been previously upheld by the Supreme Court. See *Carolene Products Co. v. U.S.,* 323 U.S. 18, 89 L.Ed. 15, 65 S.Ct. 1 (1944); *U.S. v. Carolene Products Co.,* 304 U.S. 144, 82 L.Ed. 1234, 58 S.Ct. 778 (1938). In finding authority for its review of a statute, which had formerly been held to be constitutional, the *Milnot* court stated:

"Even though the parties have previously litigated the issue of the constitutionality of the Filled Milk Act as applied to an earlier and quite similar Milnot product, subsequent litigation is not precluded where facts and conditions occurring after the prior judgment furnish a new basis for claims . . . . This court considers that the principle announced in *Chastleton Corp. v. Sinclair,* 264

U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (1924), is controlling. Writing for the Court, Mr. Justice Holmes said,

> 'A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed.' 264 U.S. at 547 & 548, 44 S.Ct. at 406."

pp. 223-224.

The court went on to state:

> "The existence of imitation milk or 'non-dairy creamers' is most certainly not irrelevant to this inquiry as the defendant contends. While Congress may select a particular evil and regulate it to the exclusion of other possible evils in the same industry, any distinction drawn must at least be rational." p. 224.

In finding that the application of the federal filled milk act to the Milnot product deprived Milnot of its constitutional rights of due process, the court stated:

> "Prevention of confusion in the market, however valid in 1944, is no longer a valid basis to sustain the Filled Milk Act  . . . .
> ". . . This court limits its decision to the conclusion, as a matter of law, that the Filled Milk Act, as applied to prohibit interstate shipment of Milnot, deprives the plaintiff of due process of law and provides no rational means for the achievement of any announced objective of the Act." p. 225.

In its decision, the court noted:

> "It is not insignificant in this regard that some eleven states which passed filled milk acts have since discarded them — five by repeal and six by court action. By far, the majority of states now permit wholesome and properly labeled filled milk products. It is worth noting, also, that when the Federal Filled Milk Act was passed by Congress and upheld by the Supreme Court, the presently accepted dangers of 'cholesterol' in animal fat were almost unknown." p. 224, n. 1.

Several state acts similar to our filled milk act and our FDPA have been held unconstitutional under a variety of circumstances and for a variety of reasons. *Milnot Company v. Arkansas State Board of Health,* 388 F. Supp. 901 (E.D. Ark. 1975); *People v. Instantwhip,* 176 Colo. 396, 490 P.2d 940 (1971); *Milnot Co. v. Douglas,* 452 F. Supp. 505 (S.D. W. Va. 1978); *State v. A.J. Bayless Markets, Inc.,* 86 Ariz. 193, 342 P.2d 1088 (1959); *Coffee-Rich, Inc. v. Commissioner of Public Health,* 348 Mass. 414, 204 N.E.2d 281 (1965); *Sun Ray Drive-In Dairy, Inc. v. Trenhaile,* 94 Idaho 308, 486 P.2d 1021 (1971). We also recognize that there have been decisions which continue to uphold similar statutes absent action by the legislature and that the foregoing cases can be distinguished from the case now before the court. However,

the principles set forth can be applied to the present case and are highly persuasive.

The Supreme Court of Arizona, in *Bayless Markets,* 86 Ariz. 193, found the Arizona law to violate the due process clause of the state constitution and the due process and equal protection requirements of the Fourteenth Amendment of the United States Constitution when applied to a properly labeled imitation ice milk. The court said at page 197:

"We are definitely of the view, however, that so long as it is sold by the local distributor in cartons describing it as an 'Imitation Ice Milk' *which is further stipulated to be nutritious, wholesome and healthful* and by the printed information on the carton advises the purchaser thereof of the ingredients used in its preparation showing the percentage of each ingredient used therein, it is not within the police power of the state to prohibit its sale. Under the circumstances above described no one could be deceived as to its nature.

"We recognize the fullness and the adequacy of the police power of the state, inherent in sovereignty, to enact legislation for the protection of the safety, health, morals and general welfare of its citizens within constitutional limitations. One of its limitations, however, is that such legislation must .bear some reasonable relationship to the object sought to be achieved. Under such circumstances courts will not substitute their judgment for that of the legislature. Edwards v. State Board of Barber Examiners, 72 Ariz. 108, 231 P.2d 450. Applying this test and bearing in mind that courts should give a sensible construction to statutes and uphold them if possible (see State v. Airesearch Mfg. Co., 68 Ariz. 342, 206 P.2d 562), we feel that A.R.S. § 3-630, supra, transcends the police powers of the state for the reason that the food products prohibited are nutritious, wholesome and healthy hence its sale and consumption by the citizens of the state does not affect the health, welfare, safety or morals of its citizens and it cannot deceive or defraud them so long as it is sold in cartons bearing the information set forth."

The Arizona court gave full-reasoned attention to the contrary decisions and the court's discussion of these cases is found at pages 199-200:

"There are decisions of the Supreme Court of the United States and state decisions which hold that a state may, under its police powers, prohibit the sale of a food product even though it may be wholesome and healthful if it is of such character as to be capable of being confused with other well known articles of food such as milk products as are involved in this case.

"Justice Holmes in the case of Hebe Co. v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 126, 63 L.Ed. 255, 259, went so far as to hold that:

'* * * If the character or effect of the article as intended to be used "be debatable, the legislature is entitled to its own judgment, and that judgment is not to be superseded by the verdict of the jury," or, we may add, by the personal opinion of the judges, "upon the issue which the legislature has decided." * * *.'

"He further stated:

'* * * The purposes to secure a certain minimum of nutritive elements and to

prevent fraud may be carried out in this way even though condensed skimmed milk and Hebe both should be admitted to be wholesome. The power of the legislature "is not to be denied simply because some innocent articles or transactions may be found within the proscribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat." * * *.'

"From our analysis of the above case favoring legislation by the states, bearing some similarity to the statutes involved in this case, we believe that Justice Holmes went further than any other case we found except the Kansas Court in State ex rel. Mitchell v. Sage Stores Co., 157 Kan. 404, 141 P.2d 655, but when boiled down to its last analysis we believe that Justice Holmes would say in this case that the statute here involved passes the bounds of reason and assumes the character of an arbitrary fiat. The Kansas case, supra, if sound, would justify the legislature in passing a law prohibiting housewives from using vegetable oils in cooking food of any kind. We reject its reasoning and its conclusion.

"Other cases holding a contrary view to that which we adopt in the instant case are: United States v. Carolene Products Co., 304 U.S. 144-145, 58 S.Ct. 778, 82 L.Ed. 1234; Carolene Products Co. v. Harter, 329 Pa. 49, 197 A. 627, 119 A.L.R. 235; Carolene Products Co. v. United States, 323 U.S. 18-32, 65 S.Ct. 1, 89 L.Ed. 15. The above decisions are all based upon the proposition that such products make it possible for fraud to be perpetrated upon the consumer public. We have shown, not only that the product in the instant case is an imitation ice cream but have shown there is printed upon the carton container the ingredients contained therein."

We now return to the undisputed facts of the instant case. Imitation has been shown to be a wholesome, nutritious, healthful and nondeleterious food whose ingredients are generally recognized as safe for human consumption. In addition, Imitation has been shown to have a further benefit of being successfully digested by certain persons who cannot tolerate or whose dietary limitations prevent the consumption of milk. Thus, as the Arizona court said in *Bayless Stores,* "[the statute] transcends the police powers of the state for the reason that the food products prohibited are nutritious, wholesome and healthy hence its sale and consumption by the citizens of the state does not affect the health, welfare, safety or morals of its citizens . . . ." 86 Ariz. at 197.

Can it be said that Imitation resembles genuine dairy products so closely that it lends itself readily to substitution for or confusion with such dairy products and in many cases cannot be distinguished from genuine dairy products by the ordinary consumer? Can it be said the sale, etc. of Imitation creates a condition conducive to substitution, confusion, deception, and fraud and a condition which if permitted to exist tends to interfere with

the orderly and fair marketing of foods essential to the well-being of the people of this state? K.S.A. 65-726. We think both questions must be answered in the negative. To hold otherwise is to say that the Kansas consumer is unable to intelligently identify the product he is purchasing or to assess its value and make price and nutritional distinctions even when the product is clearly labeled as being an *imitation of the real thing* and even though the label clearly discloses the ingredients of the product and its nutritional value. The very statutes that the defendant seeks to rely upon belie any such finding. The exceptions for chocolate-flavored products and oleomargarine clearly recognize the ability of the consumer to recognize and properly identify the product. Very few products come to mind which are so designed and marketed to compete with another product as oleomargarine. It is sold in the marketplace from the same refrigerated food departments as real butter. It is colored to resemble butter. It is packaged to resemble butter, even to the extent of being sold in the traditional ¼ pound sticks and one-pound bricks identical to butter. It is an obvious substitute for butter, is marketed as such and is far more likely to be confused with butter than Imitation is with whole milk or any other non-filled milk product. Yet our statutes indicate that any confusion, deception, fraud or substitution is avoided when the package is "plainly labeled as 'oleomargarine' or 'margarine.' " K.S.A. 65-639. Again the legislature appears to have recognized the native intelligence of the Kansas consumer when it allowed the sale of ice milk (K.S.A. 65-720) and frozen dairy desserts (K.S.A. 65-720a and b) so long as properly noticed or labeled.

One of the most obvious examples that comes to any coffee drinker's mind is the small individual serving of "cream" found in nearly every restaurant. Two of the popular brands in the Topeka area are Meyer's Half & Half, a dairy product, and Royal Danish Coffee Creamer, a non-dairy product. Coffee Creamer is sold in obvious competition with other dairy products such as Meyer's Half & Half and is intended as a substitute or replacement for the real dairy product. Coffee Creamer, however, is legal as it has no milk products among its ingredients, yet if the real thing, any milk product however slight, is added to the Coffee Creamer it becomes illegal under K.S.A. 65-727(*b*). The result is totally ridiculous and bears absolutely no reasonable relationship

to the objectives set forth by the legislature in 65-726. Likewise, the ban of Imitation, which is clearly labeled and not misleading, because it contains some amount of milk by-products when presumably it would be legal if it did not, is an unreasonable classification which will not pass constitutional muster.

In *State, ex rel., v. Sage Stores Co.,* 157 Kan. 404, Justice Hugo T. Wedell, in writing for the three-person minority, stated in his dissenting opinion many of the views which have been adopted in recent years. He stated:

"The principal issues in this lawsuit are (1) the construction of the particular statute in question with a view of determining whether it constitutes a *reasonable* health measure, and (2) whether courts, for all practical purposes, are powerless to prevent the complete suppression of a legitimate business in an article of food which is not injurious and which, on the contrary, is not only wholesome but nutritious and which by reason of its low cost and superior preservative qualities is in great demand, especially by people in the lower income groups.

"No progress can be made in answering these inquiries by dealing in generalities and platitudes relative to the subjects of 'public health,' 'morals' or 'general welfare.' Manifestly, the first inquiry requires analysis of the sweeping terms and provisions of this particular statute. Its specific terms and provisions were not analyzed and construed by this court in *Carolene Products Co. v. Mohler,* 152 Kan. 2, 102 P.2d 1044, with a view of determining whether it in fact constituted a *reasonable* health measure. Without making such analysis, which we were then, as now, asked to make, we merely announced the conclusion that the purpose of the statute was to safeguard the public health and to prevent deception upon the citizen. In my opinion that was not a sound conclusion. On the contrary, I am convinced analysis of the statute clearly discloses it is a trade-barrier law and that it was designed primarily to advance the interests of the dairy industry.

"If the statute was intended to be a health measure it must be a *reasonable* health measure. Does it constitute such a measure? I do not think so. I further believe courts have the ultimate responsibility and duty to determine whether an act constitutes such a measure or whether it is unreasonable, arbitrary and discriminatory.

"In the first place this is not an adulteration act. The subject of adulteration of foods is covered by other statutes. The great variance in the nutritive character of milk is clearly established by the evidence in this case and is also a matter of common knowledge. Its nutritive value depends upon the cow itself, the food and care it receives, the season of the year and probably some other factors. This law fixes no standard of minimum nutritive value for whole milk. Milk which is permitted to be sold may be wholly inferior in nutritive value to the product the statute condemns. The law in nowise prohibits the subtraction of any of the nutritive ingredients from whole milk. It only prohibits the addition of something. The addition which it condemns is *any* fat or oil other than a fat or oil which belongs distinctly and solely to the dairy industry. Under the clear and unambiguous provisions of this law it is wholly immaterial whether any other fat

or oil which might be added is equal or highly superior in nutritive value to milk fat. Irrespective of its value it is flatly condemned by legislative fiat.

. . . .

"The supreme courts of Michigan, Nebraska and Missouri, which have construed identical and substantially identical statutes, have condemned them as constituting unreasonable health measures notwithstanding the prominence of the dairy industries in those states. (*Carolene Products Co. v. Thomson,* 276 Mich. 172, 267 N.W. 608, *Carolene Products Co. v. Banning,* 131 Neb. 429, 268 N.W. 313; *State, ex inf. McKittrick, v. Carolene Products Co.,* 346 Mo. 1049, 144 S.W.2d 153.)

. . . .

"Why should such a law which completely suppresses a legitimate business and which also deprives the public, especially the citizens in the lower income brackets, of the advantages of scientific discovery and research be upheld as a sound public health measure? The answer certainly cannot be found in the character of the prohibited product. The principle that courts do not determine economic policies of legislation or its wisdom is elementary and requires no citation of authorities. Those are functions of the legislative branch of government with which courts cannot interfere. It is just as elementary, however, that in order for legislation such as this to be valid under the police power of the state, it cannot be arbitrary or discriminatory but must have a real and substantial relation to the objects sought to be attained. Courts are not powerless to determine the character of such legislation. The construction of statutes and the determination of their reasonableness or unreasonableness is the ultimate province, responsibility and duty of courts and must be exercised by them if state and federal constitutional guaranties of liberty and property rights are not to be made completely subservient to legislative pressure groups which all too frequently secure the enactment of measures advantageous to a particular industry and detrimental to another. The preservation of constitutional guaranties against such invasions and encroachments is one of the most sacred responsibilities courts are privileged to exercise.

. . . .

"Shall this law be upheld upon the principle that the legislature has the power and authority to select for the individual citizen what food he shall eat and drink because in the judgment of that body, supported by some creditable testimony, one kind or brand of food or drink is slightly superior in some respects to another food or drink although the latter is admittedly superior in other respects? If the legislature possesses the power to determine that fact as to one food, it manifestly has the same power with respect to every food. Such power would enable the legislature to ban many common articles of commerce as, for example, syrup not all maple, shoes not all leather (*Carolene Products Co. v. Thomson,* supra), clothes or comfortables with shoddy in them (*Weaver v. Palmer Bros. Co.,* 270 U.S. 402, 46 S.Ct. 320, 70 L.Ed. 654) and the like.

. . . .

"The instant record concedes that milk alone is deficient as a diet but certainly that fact should not justify the complete suppression of its sale. Certainly its sale is susceptible to deception. It is common knowledge that there is probably as much, if not more, deception in the sale of milk and cream by means of dilution than in the sale of any other single food product of universal consumption. The dairy industry, however, has not been suppressed. On the contrary, it often has

been regulated in the minutest details and in most instances properly so. Owing to its important relation to the public welfare it has been regulated even to the extent of fixing the price of milk. (*Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940.)

"What reasonable basis is there for believing the public cannot be protected adequately by regulation of the sale of this product? The state, in substance, insists the legislature is the judge of the reasonableness of its own acts and that if there exists any basis for completely prohibiting the sale of a healthful product, which seems reasonable to that body, courts are powerless to interfere. If a mere difference of opinion as to the comparative nutritive value of foods constitutes a reasonable basis for permitting the sale of one food and prohibiting the sale of another, court have little, if any, practical function left to perform in protecting the constitutional guaranty of a citizen's right to engage in a legitimate business. . . .

. . . .

"When the rights of the citizen come in conflict with actual public welfare, the rights of the former must, of course, yield. Manifestly that is fundamental and sound doctrine. I am, however, unwilling to see constitutional guaranties of the citizen's right to engage in a legitimate business whittled away when there is no reasonable basis for believing that the public welfare probably could not be protected adequately by regulation of the business. It is not only important that the constitutional guaranty to the citizen to transact a legitimate business should be zealously protected by the courts. It is also most vital that the public should not be deprived of its right to purchase a desirable and healthful article of food which scientific research and discovery have made available to the public at a low cost and in a form easily preserved by the citizen in the lower income groups who is not blessed with refrigeration facilities. The sale of such an article may be in competition with another industry but, under proper regulation, it cannot reasonably be said to be in conflict with the public interest and welfare." pp. 419-430.

We think Justice Wedell hit the nail on the head.

All that has been said in this opinion and the authorities cited and quoted about various filled milk statutes applies equally to our filled dairy products act which goes even further than the early statutes and singles out specific types of products for special treatment.

Inasmuch as the issue before us is limited to a determination of whether K.S.A. 65-727(*b*) is unconstitutional as to the product Imitation, we make no determination at this time as to the unconstitutionality of the Act in toto. We have no hesitancy in finding that K.S.A. 65-727(*b*) as applied to Imitation is an unconstitutional violation of plaintiffs' right to due process and the equal protection of the law.

The decision of the trial court enjoining the defendant from enforcement of the FDPA as to the selling and marketing of Imitation in Kansas is affirmed.

## MIXING INSTRUCTIONS

1. Using the chart below, dissolve indicated amount of dry product in corresponding volume of hot water by shaking vigorously in a closed container, or by mixing in a blender or mixer.
2. Add cold water up to desired quantity and chill in closed container before serving.
3. Proportions may be altered to suit individual taste.

| Volume Dry Product | Volume Hot Mixing Water | Dilute with Cold Water to: |
|---|---|---|
| ½ cup (rounded) | 1 cup | 1 quart |
| 1 cup (rounded) | 1 pint | 2 quarts |
| 2½ cups | 1 quart | 1 gallon |

## FILLED PRODUCT

### INGREDIENTS

Whey (a by-product of milk), corn syrup solids, coconut oil, sodium caseinate (a milk derivative), non-fat milk, dipotassium and calcium phosphates, mono- and diglycerides, calcium chloride, calcium carbonate, guar gum, calcium lactate, calcium sulfate, soy lecithin, salt, vitamin A, palmitate, vitamin D³, nicotinic acid, riboflavin, thiamine hydrochloride, vanillin (an artificial flavor).

## NUTRITION INFORMATION

Serving Size: Reconstituted 8 oz glass
Servings per container: 560

**Per 8 oz. Glass**

Calories ......... 90  Carbohydrates, grams ... 13
Protein, grams ......... 3  Fat, grams ......... 3

**Percentages of U.S. Recommended Daily Allowance (U.S. RDA)**

Protein ......... 8  Niacin ......... 4
Vitamin A ......... 20  Calcium ......... 15
Vitamin C ......... *  Iron ......... *
Thiamine (B¹) ......... 6  Vitamin D ......... 25
Riboflavin (B²) ......... 25
* Less than 2% U.S. RDA

DISTRIBUTED BY: Meadow Fresh Farms, Inc.
Salt Lake City, Utah 84130
IMPORTANT: Keep container sealed after use.

### IMITATION LOWFAT DRY MILK
Vitamins A & D added
Contains 14% partially hydrogenated coconut oil (vegetable oil)
When reconstituted according to directions contains 1.3% vegetable oil

DISTRIBUTED BY
Meadow Fresh Farms, Inc.
3565 South West Temple #11
P.O. Box 30105
Salt Lake City, Utah 84130
Phone (801) 261-4647

APPENDIX (A)