No. 48,409

STATE OF KANSAS, *Appellee,* v. LARRY LUGINBILL, RENE C. COLE, and KEITH J. GOULET, a/k/a KEITH J. JAMES, *Appellants.*

(574 P.2d 140)

Opinion filed November 5, 1977.

*David M. Arnold,* of Wichita, argued the cause and was on the brief for appellant Larry Luginbill.

*James M. Glover,* of Wichita, argued the cause and was on the brief for appellant Keith J. Goulet.

*David F. Carson,* of Wichita, argued the cause and was on the brief for appellant Rene C. Cole.

*Stephen M. Joseph,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, *Vern Miller,* district attorney, and *Stephen E. Robison,* assistant district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: The three appellants were convicted at a bench trial of possession with intent to sell a large quantity of marihuana to an undercover agent. The appellants, Larry Luginbill, Rene C. Cole, and Keith J. Goulet, were jointly charged and tried. They join in an appeal to this court but are represented by different attorneys.

In order to understand the first two arguments on appeal some preliminary facts must be developed. The statute in effect at the time of the incident reads:

" 'Marihuana' means all parts of the plant *Cannabis sativa L.,* whether growing or not, the seeds thereof, the resin extracted from any part of the plant and every compound, manufacture, salt, derivative, mixture or preparation of the plant, its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the mature stalks, except the resin extracted therefrom, fiber, oil, or cake or the sterilized seed of the plant which is incapable of germination." (K.S.A. 65-4101 [*o*].)

At trial Linda Lea Morgan Voss, a forensic chemist, testified as to tests she performed on the substance and concluded it was Cannabis sativa L., marihuana, containing tetrahydrocannabinol (THC).

Defense counsel examined Ms. Voss as to the difference in two schools of thought as to classification of marihuana. Ms. Voss testified she followed the monotypic theory of classification, *i.e.,* there is one species of the genus Cannabis, sativa, and there are varieties of that species such as indica, ruderalis, Americus, and Mexicanus, which refer to the locale of growth. The polytypic theory, which she does not subscribe to, is that there is more than one species of the genus Cannabis, which species include sativa, indica and ruderalis. She stated she could not distinguish between the three varieties with the standard tests. She testified different varieties can only be identified in the growing plant. They cannot be identified after the plants are crushed and processed.

The defendants' contention here is that the legislature in K.S.A. 65-4101 (*o*) did not define marihuana to embrace all Cannabis but only Cannabis sativa L. The defendants argue that this necessarily excludes all other "species" from the statute's proscription.

The defense attorneys cite this court to two cases in their favor *(United States v. Lewallen,* 385 F. Supp. 1140 [W.D.Wis. 1974]; *United States v. Collier,* Crim. N. 43604-73 [Super. Ct. D.C.

1974]). However, they neglect to mention that nine of the ten federal circuit courts which have considered this issue have rejected this argument and have held the same language in the Comprehensive Drug Abuse Prevention and Control Act of 1970 was intended to and does include all forms of Cannabis. This includes the 10th Circuit; see *United States v. Ludwig,* 508 F.2d 140 (10th Cir. 1974). Additionally, more than 20 states with similar language in their state statutes have rejected appellants' argument. We find no clear cases to support appellants' position.

In *United States v. Kelly,* 527 F.2d 961 (9th Cir. 1976), the court notes some of the holdings of the various circuit courts and continues:

"Faced with this array of authority, and numerous state court decisions to the same effect, Kelly's position finds little support other than *United States v. Lewallen,* 385 F. Supp. 1140 (W.D.Wis. 1974). . . . Of particular significance is the fact that the judge in *Lewallen* relied principally upon *United States v. Collier* (March 19, 1974), an unreported Superior Court case from the District of Columbia. That *Collier* was a slender reed on which to fashion a decision was made clear on March 5, 1975, when the District of Columbia Court of Appeals, *sub silentio* overruled that decision by reversing four other cases where trial judges had dismissed indictments on the same theory. *See United States v. Johnson,* D.C.App., 333 A.2d 393 (March 5, 1975), . . ." (pp. 963-964.)

The *Lewallen* case appears to support defendants' contention. However, it was not appealable and the court of appeals for the 7th Circuit has not finally addressed the issue.

One of the most complete discussions of this issue is found in *United States v. Walton,* 514 F.2d 201 (D.C.Cir. 1975). That court noted the defendant's expert testified that, applying the polytypic approach, four species existed other than sativa L. (indica, ruderalis, gigantea, and an Afghanistan species as yet unnamed) but conceded all five contain the toxic agent tetrahydrocannabinol which produces the hallucinogenic or euphoric effects which led to the congressional ban on marihuana. The court, pointing out that the defendant was arguing congress intended to ban the euphoric effects of sativa L. but not those of the other species, reasoned:

" . . . This result seems manifestly unreasonable and furthermore could raise the most serious equal protection problems if it were adopted, *i.e.* an individual convicted for distribution of sativa L. could state with more than a little justification that no legitimate legislative purpose permits the government to jail persons who obtain a THC "high" from sativa L. but to not prosecute persons who obtain the exact same "high" from another species. Moreover, Walton's

expert concedes that at present there is no reliable biochemical or spectrographic method for distinguishing between the various species of marijuana. Thus, unless the government has access to the growing plant, an unlikely situation, it can not at present prove that a given defendant possesses one kind of marijuana or another. It may be that the government has the capacity to develop a method but since Congress did not have the benefit of any such method when it enacted the statute in issue here, one must certainly pause to consider why Congress would enact a law the violations of which could not be proven on the basis of present knowledge. Even if Congress did have such a method, it is apparently conceded that only citizens with expert botanical knowledge could distinguish between the various species of marijuana. This suggests a serious due process question: could the government prosecute an individual for possession of sativa L. when there are no means whereby the average citizen can distinguish between sativa L. and other species to thus conform his conduct to the requirements of the law? It presses us to extremes to hold that Congress would enact a law the violations of which are not detectable to the group of citizens to whom the law is addressed." (pp. 202-203.)

The *Walton* court then turned to the federal legislative history, noting that although the defendant was convicted under the Controlled Substances Act of 1970, the definition of marihuana there was from the Marijuana Tax Act of 1937. The *Walton* court stated the legislative history shows that the 1937 definition was intended to include those parts of marihuana containing THC and exclude those which did not. No testimony before congress was found that marihuana was anything but monotypical.

Some of this legislative history of the Federal Drug Abuse Prevention and Control Act (21 U.S.C. § 801, *et seq.*) is set forth in *United States v. Rothberg,* 351 F.Supp. 1115 (E.D.N.Y. 1972), which was affirmed by the 2nd Circuit in *United States v. Rothberg,* 480 F.2d 534 (2nd Cir. 1973), cert. den. 414 U.S. 856, 38 L.Ed.2d 106, 94 S.Ct. 159 (1973).

The definition of marihuana in our 1972 Uniform Controlled Substances Act (K.S.A. 65-4101 [o]) and the Federal Drug Abuse Prevention and Control Act (21 U.S.C. § 801, *et seq.*) are virtually identical. The year the Federal Act was enacted the National Conference of Commissioners on Uniform State Laws adopted the Uniform Controlled Substances Act (1970). Two years later Kansas adopted the Uniform Controlled Substances Act.

We conclude the definition of marihuana contained in K.S.A. 65-4101 (o) of the Kansas Uniform Controlled Substances Act, enacted in 1972, was intended to include those parts of marihuana which contain the chemical tetrahydrocannabinol, to exclude those parts which do not, and to outlaw all plants popularly

known as marihuana to the extent they possess the chemical regardless of the possible existence of more than one species of marihuana.

The principles of statutory construction in Kansas vary little from those employed in the federal cases cited. In *State v. Bishop,* 215 Kan. 481, 524 P.2d 712, the court quoted the rules of construction of penal statutes from an earlier case, *State, ex rel., v. American Savings Stamp Co.,* 194 Kan. 297, 398 P.2d 1011:

" 'It is a fundamental rule that penal statutes must be strictly construed in favor of the persons sought to be subjected to their operations. The rule of strict construction simply means that ordinary words are to be given their ordinary meaning. Such a statute should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it.

" 'The object of the rule is to establish a rule of certainty to which the individual may safely conform without fear of the statute being misinterpreted by a court or prosecutor. If we go beyond the fair meaning of the language used in the statute and attempt enlargement by implication or intention we have abandoned certainty. . . . Aid cannot be sought from outside facts or circumstances, which would leave the results uncertain depending on the energy or the discretion of the investigator. Although the courts in determining the intention of the legislature may look to existing conditions, the causes which impelled the enactment and the object sought to be obtained, such factors in considering a penal statute should be matters of common knowledge.' . . ." (p. 483.)

We have stated:

"The fundamental rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statute." *(State v. Dumler,* 221 Kan. 386, Syl. 1, 559 P.2d 798.)

Also, this court has said:

"In determining legislative intent, courts are not limited to a mere consideration of the language employed but may properly look to the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished and the effect the statute may have under the various constructions suggested." *(State, ex rel., v. City of Overland Park,* 215 Kan. 700, Syl. 10, 527 P.2d 1340; also *State, ex rel., v. Kalb,* 218 Kan. 459, 464, 543 P.2d 872.)

Considering the purpose to be accomplished by the enactment, we come to the conclusion that the prohibition was aimed at the euphoric effects produced by the species. This is illustrated by the specific enumeration in this statute of those parts of the plant known to cause the euphoric or hallucinogenic effects. This purpose is a matter of common knowledge, and thus it is entirely proper for the court to consider it.

Following the rule stated in *State, ex rel., v. City of Overland Park,* supra, this court should consider the effect the statute would have under various constructions. Adopting the defendants' interpretation would lead to impossible results. (See discussion in *United States v. Walton,* supra, pp. 202-203, quoted above.) It would appear from the testimony from Ms. Voss as well as that appearing in the many cases deciding this issue that the "species", if they are that, can only be distinguished in the growing plant. The result would be that the citizens at whom the statute's prohibition was intended would be unable to know whether or not they were violating the statute. The police would be unable to distinguish for purposes of arrest and seizure, and the prosecution would be unable to secure a conviction. It is highly unlikely the legislature intended to pass a statute which could not be enforced.

Although we are aware of the rule of strict construction, the defendants' argument must nevertheless fail. As was stated in *United States v. Bettenhausen,* 499 F.2d 1223 (10th Cir. 1974):

" . . . While penal statutes are strictly construed, the maximum [*sic*] is not a command to override common sense and the evident statutory purpose. [Citations omitted.]" (p. 1234.)

Defendants urge the maxim *"expressio unius est exclusio alterius"* mandates their suggested construction. However, this is answered in language from *In re Olander,* 213 Kan. 282, 515 P.2d 1211:

"One of the more common rules of statutory interpretation is that expressed in the Latin maxim *expressio unius est exclusio alterius, i.e.,* the mention or inclusion of one thing implies the exclusion of another. This rule may be applied to assist in determining actual legislative intent which is not otherwise manifest, although the maxim should not be employed to override or defeat a clearly contrary legislative intention. [Citations omitted.]" (p. 285.)

Applying these rules of construction to the case at hand it is clear the intent of the Kansas legislature in enacting this statute was to make the prohibition apply to all marihuana and not to make a distinction between varieties (under the monotypic theory) or species (under the polytypic theory). The "ordinary meaning" of the word "marihuana" certainly includes all varieties. The language gave fair notice with no lack of certainty as to what was and what was not illegal. Rather, a lack of certainty would exist if the court were to accept defendant's argument.

There is no error shown on this point.

Appellants further argue that K.S.A. 65-4101 (o) is unconstitutionally vague and indefinite and constitutes a violation of due process because of the use of "Cannabis sativa L." in the definition.

We have previously addressed this argument. The language of the statutes, K.S.A. 65-4101 (o), K.S.A. 65-4105 (d), and K.S.A. 1973 Supp. 65-4127b, defining and proscribing the possession and sale of marihuana conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. Appellants' argument that the statute proscribing possession of marihuana with intent to sell is unconstitutionally vague and indefinite is without merit.

The final three points in this appeal are raised by appellants Goulet and Cole. They challenge the sufficiency of the evidence to establish their participation in the possession of marihuana with intent to sell. Therefore it is necessary to review the evidence introduced at trial.

The prosecution relied largely on the testimony of Jack Hiebert, an undercover agent working for the Sedgwick County sheriff's office. He met Goulet in a tavern in Wichita and told Goulet he had to leave Wichita because of "heat" from the law enforcement agencies. He was going to Garden City and wanted some "goodies" to take with him. Goulet advised Hiebert he knew where Hiebert could get 50 pounds. Goulet promised to check on it and contact Hiebert. Hiebert returned to the tavern later but the person Goulet was expecting did not show up. At a subsequent meeting Goulet and Cole were together. Hiebert advised them that he could "handle" as much as 500 pounds. Goulet asked Hiebert to meet him the next morning at the tavern.

The following day Goulet and Hiebert met at the tavern but Goulet had not yet contacted the person who was to supply the marihuana. They met a couple of times after that and on June 9, Hiebert advised Goulet he was leaving for Garden City with or without the marihuana. Hiebert gave Goulet his phone number. Nothing further transpired until the 15th when Goulet phoned Hiebert and said he was ready to deal. There were further delays but eventually they met at another lounge. At this meeting Hiebert, Goulet, Luginbill and Cole were present. Goulet talked to Luginbill and then Luginbill and Cole left the lounge to see

about the deal. Before leaving Cole told Goulet he was taking Luginbill "to see about the dope". When they returned arrangements were made to meet at Hiebert's motel room at 2:00 a.m. the next morning. Cole told Hiebert, "Don't worry, we'll get you some stuff." Cole, Goulet and Luginbill showed up at the motel the next morning and Luginbill stated he had 25 kilos of marihuana. Cole helped compute the selling price.

All four then left for an apartment complex. Cole drove Luginbill to the complex. Luginbill entered and came back with a "brick" of marihuana which was opened and tested. Cole took part in the testing. Hiebert then made a call to get his money. While waiting Luginbill stated he would make $400.00 and that Goulet would make approximately $250.00 on the deal.

A plain clothes officer in an unmarked car arrived with the money ($6,150.00) and after Luginbill was shown a roll of one hundred dollar bills he obtained two duffle bags of marihuana from the trunk of a car. The marihuana was placed in the back of Hiebert's pickup. At this time the three defendants, all of whom were present, were arrested.

Both Goulet and Cole participated in negotiations leading to the aborted sale of the marihuana. All of the defendants were present when the 25 kilos of marihuana were tested and then transferred to Hiebert. The substance was identified as marihuana by the forensic chemist after chemical tests had been conducted.

Under the rule stated in *State v. Steward,* 219 Kan. 256, Syl. 14, 547 P.2d 773, the state's evidence was sufficient to establish *prima facie* cases, and under the rule stated in *State v. Wilson & Wentworth,* 221 Kan. 359, Syl. 2, 559 P.2d 374, the trial court did not err in refusing to direct verdicts of acquittal.

The final argument of Goulet and Cole is that the evidence conclusively established they were merely "procuring agents" for the buyer, Hiebert, under the law declared in *State v. Osburn,* 211 Kan. 248, 505 P.2d 742. Whether the appellants were selling agents of the narcotic or merely procuring agents for the buyer was a question of fact to be determined from the evidence by the trier of fact. See *State v. Fitzgibbon,* 211 Kan. 553, 507 P.2d 313, and *State v. Osburn,* supra. This was a bench trial and the trial judge resolved the question in favor of the prosecution. On appellate review these convictions must stand. See *State v. So-*

*verns,* 215 Kan. 775, 529 P.2d 181; and *State v. Baker,* 219 Kan. 854, 549 P.2d 911.

The judgments of conviction are affirmed.