**GENERAL FOODS CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**Harland E. PRIDDLE, Secretary of the Kansas State Board of Agriculture; Brace Rowley, Dairy Commissioner of the State of Kansas; and the Kansas State Board of Agriculture, Defendants,**

**Associated Milk Producers, Inc., and Mid-America Dairymen, Inc., Intervenors.**

**No. 82–4111.**

United States District Court, D. Kansas.

Aug. 9, 1983.

Burditt & Calkins, Chicago, Ill., George M. Burditt & Robert G. Epsteen, Fisher, Patterson, Sayler & Smith, Donald Patterson, Topeka, Kan., Michael J. Quillinan, General Foods Corp., White Plains, N.Y., for plaintiff.

Kenneth Wilke, Topeka, Kan., for defendants.

Boyer, Donaldson & Stewart, Wichita, Kan., for intervenors.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action brought by the plaintiff, General Foods Corporation, to enjoin the defendants, Harland E. Priddle, Secretary of the Kansas State Board of Agriculture, Brace Rowley, Dairy Commissioner of the State of Kansas, and the Kansas State Board of Agriculture, from prohibiting the sale of their frozen whipped toppings with dairy ingredients within the State of Kansas under the provisions of the Kansas filled

dairy products act (FDPA), K.S.A. 65–725 *et seq.* This opinion represents the findings of fact and conclusions of law in this case in accordance with F.R.Civ.P. 52.

In 1965, after many years of research, plaintiff introduced a product called Cool-Whip, a frozen non-dairy whipped topping designed to be used as a garnish on desserts or to be mixed with other dessert products in the home for special recipes. The topping is prepared by homogenizing non-dairy ingredients: sodium caseinate, vegetable oil, sugar, emulsifiers and stabilizers. It is a wholesome product which clearly identifies its ingredients on its label. The product resembles whipped cream, a dairy product, in color, consistency and taste. It was developed to serve essentially the same function as whipped cream. However, it is also different from whipped cream in several ways. It is packaged and sold in different containers. Cool-Whip is sold in bowl-shaped tubs while whipped cream is generally sold in aerosol cans or in milk cartons in its pre-whipped state. Further, since Cool-Whip is a frozen product, it is sold in the freezer section of the grocery store while whipped cream is sold in the refrigerated area where other dairy products are sold. Finally, Cool-Whip and other non-dairy whipped toppings have a much longer shelf life than whipped cream. The public has enthusiastically accepted Cool-Whip and its similar competitive products. Plaintiff's sales of Cool-Whip have grown to $125 million annually with a Kansas sales volume of over $3 million.

In the early 1980's, frozen whipped toppings with dairy ingredients were developed for the first time. The use of dairy products was considered to be an improvement in the product because of improved flavor and texture. Nonetheless, the product remained essentially the same as non-dairy whipped toppings in terms of color, taste and consistency. The new product was also packaged and marketed in almost the identical manner as non-dairy whipped toppings. The labels of these new products clearly indicated that they contained dairy ingredients. The new products remained completely wholesome. In 1982, plaintiff planned to introduce its two new frozen whipped toppings with dairy products—Dover Farms Whipped Topping and Cool-Whip Extra Creamy Whipped Topping—into Kansas. Plaintiff's officials met with Kansas officials, including defendant Rowley, regarding the planned introduction of Dover Farms into the state. The discussions centered around whether the FDPA applied and thus prohibited the sale of plaintiff's product in the State of Kansas. At the time of the discussions, state officials failed to reach a determination on the issue and plaintiff went ahead with its nationwide campaign to introduce Dover Farms. Plaintiff planned to introduce the product to the public during strawberry season. On February 8, 1982, the Dover Farms product was released in Missouri and Kansas. Thereafter, defendant Rowley advised the plaintiff that Dover Farms was in violation of the FDPA and began notifying wholesalers and retailers that this product could not be sold in Kansas. On May 14, 1982, the plaintiff filed the instant lawsuit. Plaintiff sought injunctive and declaratory relief under 42 U.S.C. §§ 1983, 1985 and 1986. Plaintiff sought to enjoin the defendants from prohibiting the sale of their whipped toppings with dairy products within the State of Kansas.

On May 19, 1982, this court, after a hearing, issued a temporary restraining order preventing the defendants from prohibiting the sale of plaintiff's two new products in Kansas until the court could consider plaintiff's motion for a preliminary injunction. Thereafter, on June 7, 1982, the court heard evidence on plaintiff's motion for a preliminary injunction. At that time, the Associated Milk Producers, Inc., and the Mid-America Dairymen, Inc., moved to intervene in this case and their motions were sustained. At the hearing, it was agreed by the parties that the evidence presented at the earlier hearing on plaintiff's motion for a temporary restraining order could be considered by the court in determining plaintiff's preliminary injunction motion. It was further stipulated by the parties, pursuant to F.R.Civ.P. 65(a)(2), that the merits of plaintiff's complaint would be consolidated with the preliminary injunction motion.

Before considering the arguments of the parties, it is first necessary to set forth the various pertinent provisions of the FDPA. K.S.A. 65–728 makes it unlawful for any person to manufacture, sell, exchange, or offer for sale or exchange any "filled dairy product." The penalty for a violation of the FDPA, as set forth in K.S.A. 65–729, is a fine not to exceed five hundred dollars or by imprisonment not to exceed one year or both. A "filled dairy product" is defined as follows:

> [A]ny milk, cream or skimmed milk or any combination thereof, whether or not condensed, evaporated, concentrated, frozen, powdered, dried or desiccated, or any food product made or manufactured therefrom, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, or any solids other than milk solids, except sweeteners, stabilizers and flavorings, so that the resulting product is in imitation or semblance of any dairy product, including but not limited to, milk, sour cream, butter cream, skimmed milk, ice cream, ice milk, whipped cream, flavored milk or skim milk drink, dried or powdered milk, cheese, cream cottage cheese, ice cream mix, sherbet, condensed milk, evaporated milk, or concentrated milk: *Provided, however,* That this term shall not be construed to mean or include: (1) Any distinctive proprietary food compound not readily mistaken for a dairy product, when such compound is customarily used on the order of a physician and is prepared and designed for medicinal or special dietary use and prominently so labeled; (2) any dairy product flavored with chocolate or cocoa, or the vitamin content of which has been increased, or both, where the fats or oils other than milk fat contained in such product do not exceed the amount of cocoa fat naturally present in the chocolate or cocoa used and the food oil, not in excess of one-hundredth of one percent of the weight of the finished product used as a carrier of such vitamins; or (3) oleomargarine, when offered for sale and sold as and for oleomargarine.

K.S.A. 65–727(b).

The purposes of the FDPA are contained in K.S.A. 65–726:

> Filled dairy products resemble genuine dairy products so closely that they lend themselves readily to substitution for or confusion with such dairy products and in many cases cannot be distinguished from genuine dairy products by the ordinary consumer. The manufacture, sale, exchange or offering for sale or exchange of filled dairy products creates a condition conducive to substitution, confusion, deception, and fraud, and one which if permitted to exist tends to interfere with the orderly and fair marketing [of] foods essential to the well-being of the people of this state. It is hereby declared to be the purpose of this act to correct and eliminate the condition above referred to; to protect the public from confusion, fraud, and deception; to prohibit practices inimical to the general welfare; and to promote the orderly and fair marketing of essential foods.

In seeking to enjoin the defendants from prohibiting the sale of its new products in Kansas under the FDPA, plaintiff advances a number of arguments. First, plaintiff contends that the FDPA is not applicable to its new products. Second, plaintiff argues that the FDPA violates the due process clause of the fourteenth amendment because of its vagueness. Third, plaintiff asserts that the FDPA violates the equal protection clause of the fourteenth amendment because it has no substantial relationship to its purported purpose. Finally, plaintiff contends that the FDPA violates Article I, Section 8 of the Constitution because it imposes an undue burden on interstate commerce. Defendants, of course, contend that the FDPA is applicable to plaintiff's new products and that the FDPA is constitutional as a valid exercise of the state's police power. Defendants argue that they are immune from suit here by virtue of the eleventh amendment. They also argue that the plaintiff has failed to establish the ex-

istence of a conspiracy pursuant to 42 U.S.C. §§ 1985 and 1986. The intervenors have raised the question of whether the court should defer to the state courts on the issue of whether the FDPA is applicable to plaintiff's new products. The other arguments made by the intervenors are similar to those raised by the defendants.

■■■ The court shall first consider the abstention issue raised by the intervenors. The intervenors assert that the court should defer to the state courts on the issue of the applicability of the FDPA to the plaintiff's new whipped toppings. It is apparent that the intervenors are arguing for the application of the abstention doctrine enunciated in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *Pullman* stands for the general proposition that a federal court ordinarily should refrain from deciding a case in which state action is challenged on federal constitutional grounds if the case can, given a particular resolution of an "unclear" question of state law, be decided on a state law ground. 17 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4242, p. 449 (1978). While ambiguity in a state's law and the likelihood of avoiding constitutional adjudication are both necessary for *Pullman* abstention, they are not always sufficient since abstention is a matter of discretion for federal courts. *Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964). Federal courts should normally defer to the state courts where the state law is (1) "unclear" but (2) "reasonably susceptible" of an interpretation that would make adjudication of the plaintiff's federal constitutional claim unnecessary. *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 307, 99 S.Ct. 2301, 2313, 60 L.Ed.2d 895 (1979). As the following discussion of the applicability of the FDPA to plaintiff's products indicates, we do not find that the state law is unclear and thus we shall not abstain on the issue.

The court shall now discuss the applicability of the FDPA to plaintiff's products. Plaintiff has made two arguments in this case regarding the application of the FDPA. Plaintiff argued initially in this case that the FDPA was not applicable to its whipped toppings with dairy products because these products were not dairy products to which non-dairy fats, oils or solids had been added, but rather, were non-dairy products to which dairy products had been added. *See* Complaint ¶ 21, p. 5, Doc. # 1; Exhibit A to Affidavit of Murray Sayer, p. 2, Doc. # 4. Plaintiff also argued that the FDPA was not applicable to its new toppings because the new products were not "in imitation or semblance of any dairy product". The former argument has either been dropped or combined with the latter argument. *See* Plaintiff's Reply Brief, p. 9, Doc. # 43. In any event, the court shall consider both arguments. The court must note that plaintiff's arguments have some appeal; yet, when thoroughly considered, they must be rejected.

■ Since the FDPA does contain criminal penalties, it must be regarded as a penal statute. In *National Cooperative Refining Association v. Board of McPherson County Commissioners,* 228 Kan. 595, 597, 618 P.2d 1176 (1980), the rules for the construction of penal statutes are set forth:

> The fundamental rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statute. *State ex rel. Stephan v. Lane,* 228 Kan. 379, 390, 614 P.2d 987 (1980); *Nordstrom v. City of Topeka,* 228 Kan. 336, Syl. ¶ 1, 613 P.2d 1371 (1980); *State v. Luginbill,* 223 Kan. 15, 19, 574 P.2d 140 (1977).

> . . . .

> Penal statutes must be statutorily construed in favor of the persons sought to be subjected to their operations. The rule of strict construction simply means that ordinary words are to be given their ordinary meaning. Such a statute should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it. *State v. Luginbill,* 223 Kan. at 19, 574 P.2d 140, relying upon *State v. Bishop,* 215 Kan. 481, 483, 524 P.2d 712

(1974) and *State, ex rel., v. American Savings Stamp Co.,* 194 Kan. 297, 300, 398 P.2d 1011 (1965).

Plaintiff contends that for a product to be subject to the FDPA it must come within each of the following requirements: (1) it must initially be a dairy product; (2) non-dairy fats, oils or solids must be added to or blended or compounded with that dairy product; and (3) the final product must be an imitation or semblance of a dairy product. Here, plaintiff argues that since its new products were non-dairy products to which dairy products have been added then the first two requirements of the FDPA are not met. It appears that plaintiff's above-mentioned construction of the FDPA is based upon the following language of K.S.A. 65–727(b) defining a filled dairy product: "any milk, cream or skimmed milk or any combination thereof, whether or not condensed, evaporated, concentrated, frozen, powdered, tried or desiccated, or any food product made or manufactured therefrom, *to which has been added . . .* any fat or oil other than milk fat, or any solids other than milk solids . . ." (emphasis added). However, as correctly pointed out by the defendants, plaintiff's construction of the statute ignores the phrase following "to which has been added" which reads "or which has been blended or compounded with." Giving the ordinary meaning to the words of the statute, the court finds it to be clear that the legislature intended a filled dairy product to contain a combination of a dairy ingredient and a non-dairy fat or oil with no difference being recognized for the manner in which the non-dairy and dairy ingredients are combined. The act of blending or compounding does not contemplate a mixture in any specific order. This is defendant Rowley's interpretation of the statute and we find it to be proper. Thus, we find no merit to plaintiff's first argument regarding the applicability of the FDPA.

We shall now consider the plaintiff's arguments regarding whether its new toppings are an imitation or semblance of a dairy product. It is the contention of the plaintiff that its new products are an imitation and semblance of only one category of products, a frozen non-dairy topping such as Cool-Whip. Plaintiff asserts that its two new toppings do not imitate or resemble whipped cream, a dairy product. Plaintiff bases its argument upon the following differences between its new whipped toppings and whipped cream: (1) whipped cream is sold in aerosol cans while whipped toppings are sold in tubs; (2) whipped cream is sold in the refrigerated area of grocery stores with other dairy products while whipped toppings are sold in the frozen foods area with products such as frozen pies, vegetables and juices; and (3) whipped cream contains approximately twice the amount of calories as whipped toppings. Defendants contend that, based on the various factors utilized by the Dairy Commissioner to determine whether a filled dairy product is an imitation or semblance of a dairy product, plaintiff's new toppings do imitate or resemble whipped cream. The factors considered by the Dairy Commissioner include the labeling of the product, the use of the product by the consumer, and any physical resemblance of the product to a known dairy product.

Plaintiff relies upon *Coffee-Rich, Inc. v. Kansas State Board of Health,* 192 Kan. 431, 388 P.2d 582 (1964) for support of its argument on the "imitation or semblance" issue. Plaintiff contends that this phrase should be construed as it was in *Coffee-Rich.* A thorough review of *Coffee-Rich* demonstrates the flaws in plaintiff's argument.

In *Coffee-Rich,* the Kansas Supreme Court faced the issue of whether Coffee-Rich, a non-dairy coffee enricher and whitener, was an imitation of milk, half and half or cream and thus in violation of a Kansas statute providing that a food is misbranded if it is an imitation of another food and does not bear a label containing the word "imitation" preceding the name of the food imitated. The court concluded that Coffee-Rich was not an imitation of milk, cream or half and half. Rather, it found that Coffee-Rich was a new and different food product having its own unique characteristics. Concerning the issue of

whether Coffee-Rich was an imitation of another food, the Court stated:

> We reach the unescapable conclusion that Coffee-Rich is not an imitation of cream or half-and-half and that it is a new and distinct food product having characteristics unique unto itself. Coffee-Rich is no more an imitation of cows' cream, half-and-half, or any other dairy product than nylon is an imitation of silk, saccharin an imitation of sugar, or Crisco an imitation of lard. Those products, and Coffee-Rich, are separate, distinct, individual products developed as a result of modern scientific and technical advances and inventions. They are products *sui generis*. (*Midget Products, Inc. v. Jacobsen,* supra [140 Cal.App.2d 517, 295 P.2d 542 (1956)].)

192 Kan. at 438, 388 P.2d 582.

Relying on *Coffee-Rich,* plaintiff argues that its new products are *sui generis* in that they have been developed as a result of modern scientific and technical advances and inventions. Plaintiff asserts that there is no such food item as a "genuine" frozen whipped cream available for purchase by the consumer.

We do not find *Coffee-Rich* persuasive under the circumstances of this case. The language of the statute involved in *Coffee-Rich* is different from the language used in the FDPA. In *Coffee-Rich,* the key determination under the statute was whether the product in question was an "imitation" of another food product. Here, the statute requires that a product containing dairy and non-dairy ingredients be an "imitation or semblance of any dairy product." Thus, the FDPA contains the additional words "or semblance." We believe the use of the words "or semblance" broadens the meaning of the definition of a filled dairy product beyond that prohibited by the statute in question in *Coffee-Rich.* In *Coffee-Rich,* the Court found that Webster's Dictionary defined imitation as "That which is made or produced as a copy; an artificial likeness; a counterfeit; simulating something superior . . ." 192 Kan. at 435, 388 P.2d 582. Funk & Wagnall's Standard Dictionary defines semblance as "1. A mere show without reality; pretense. 2. Outward appearance.

3. A likeness or resemblance." The Court in *Coffee-Rich* recognized the difference between imitation and semblance when they stated: "The word "imitation" imparts more than mere resemblance or similitude." 192 Kan. at 437, 388 P.2d 582. This distinction was also recognized in *Coffee-Rich, Inc. v. Commissioner of Public Health,* 348 Mass. 414, 204 N.E.2d 281, 285 (1965), where the court stated:

> We are aware of the usual connotations of the word "imitation" which are elaborately expounded by the plaintiff and which might have persuaded courts in other jurisdictions to hold Coffee-Rich or products like it as outside the statutory meanings of the word. See *Coffee-Rich, Inc. v. Kansas State Bd. of Health,* 192 Kan. 431, 437–438, 388 P.2d 582; *Dairy Queen of Wis. Inc. v. McDowell,* 260 Wis. 471, 476–477, 51 N.W.2d 34, 52 N.W.2d 791. But see, *United States v. 651 Cases, More or Less, of Chocolate Chil-Zert,* D.C., 114 F.Supp. 430, 432–433. However, our statute speaks not simply of "imitation," but of "imitation *or semblance*" (emphasis supplied). We are thus concerned, as we were in *Aeration [Processes, Inc. v. Commissioner of Public Health,* 346 Mass. 546, 194 N.E.2d 838 (1963)], with actual or apparent resemblance or similarity. See Webster's Third New Intl. Dictionary at p. 2062.

In sum, we do not find the *Coffee-Rich* decision persuasive on the issue of whether plaintiff's new whipped topping products are an "imitation or semblance" of a dairy product.

Plaintiff further relies upon the testimony of defendant Rowley for support of its argument that its new products are not an "imitation or semblance" of whipped cream. At one point during his testimony, on cross-examination, Dairy Commissioner Rowley did state that he thought plaintiff's new products were an imitation or semblance of non-dairy whipped toppings and not an imitation or semblance of aerosol whipped cream or pure pack whipping cream. These responses were in direct contradiction to his previous testimony. The court is at a loss

to explain these contradictory answers except to note that Rowley was perhaps focusing on the frozen nature of plaintiff's new products in accord with plaintiff's counsel's line of questioning. A review of defendant Rowley's entire testimony makes it clear that he found plaintiff's new whipped toppings with dairy ingredients to resemble whipped cream and thus come under the provisions of the FDPA. The court simply does not find the one instance in which plaintiff's counsel received favorable answers from the defendant to be persuasive in light of his overall testimony.

The evidence showed that plaintiff's new whipped toppings were quite similar to whipped cream in color, taste and consistency. Further, plaintiff's new products were used for the same purposes as whipped cream. The labels of these products show a substance topped with a strawberry that looks very similar to whipped cream. It was the testimony of plaintiff's own expert witness, Louise Hartman, a home economist, that Dover Farms does resemble whipped cream and is used in the same manner as genuine whipped cream. The court recognizes that there are differences between plaintiff's new products and whipped cream. However, we reach the unescapable conclusion that Dover Farms Whipped Topping and Cool-Whip Extra Creamy Whipped Topping are semblances of whipped cream, a dairy product. We would be stretching the common understanding of the word "semblance" if we were to find that plaintiff's new products did not resemble whipped cream. Accordingly, we find that the provisions of the FDPA are applicable to plaintiff's new whipped toppings.

Having determined that the FDPA is applicable to plaintiff's whipped toppings, we must now consider the other contentions put forth by the parties. With regard to most of the arguments made by the parties, the court has recently received considerable assistance on these matters by virtue of a well-written opinion by the Kansas Supreme Court on January 14, 1983, in *Strehlow v. Kansas State Board of Agriculture*, 232 Kan. 589, 659 P.2d 785 (1983).

In *Strehlow*, the distributors of a filled dairy product, "Imitation Lowfat Dry Milk," brought an action against the Kansas State Board of Agriculture challenging the constitutionality of the FDPA. The trial court, in an opinion by the Honorable Terry Bullock, had found that the provisions of the FDPA as applied to plaintiff's product violated the equal protection clause of the fourteenth amendment. The Supreme Court affirmed. A review of the Court's decision is enlightening.

The Supreme Court noted the stated purposes of the FDPA contained in K.S.A. 65–726 but also found perhaps another unwritten goal of the FDPA:

> One nonstated objective may be the economic protectionist aspect of the act which many consider as legislation to promote and protect the dairy industry. The fact that the industry does have an economic interest in the preservation of the restrictions imposed by the FDPA is borne out by the filing of an *amici* brief by Associated Milk Producers, Inc., and Mid-America Dairymen, Inc., cooperative marketing associations formed to market the milk and milk products of their member producers.

232 Kan. at 593, 659 P.2d 785.

In resolving the issue before it, the Court stated:

> Can it be said that Imitation resembles genuine dairy products so closely that it lends itself readily to substitution for or confusion with such dairy products and in many cases cannot be distinguished from genuine dairy products by the ordinary consumer? Can it be said the sale, etc. of Imitation creates a condition conducive to substitution, confusion, deception, and fraud and a condition which if permitted to exist tends to interfere with the orderly and fair marketing of foods essential to the well-being of the people of this state? K.S.A. 65–726. We think both questions must be answered in the negative. To hold otherwise is to say that the Kansas consumer is unable to intelligently identify the product he is purchasing or to assess its value and make price and

nutritional distinctions even when the product is clearly labeled as being an *imitation of the real thing* and even though the label clearly discloses the ingredients of the product and its nutritional value. The very statutes that the defendant seeks to rely upon belie any such finding. The exceptions for chocolate-flavored products and oleomargarine clearly recognize the ability of the consumer to recognize and properly identify the product. Very few products come to mind which are so designed and marketed to compete with another product as oleomargarine. It is sold in the marketplace from the same refrigerated food departments as real butter. It is colored to resemble butter. It is packaged to resemble butter, even to the extent of being sold in the traditional ¼ pound sticks and one-pound bricks identical to butter. It is an obvious substitute for butter, is marketed as such and is far more likely to be confused with butter than Imitation is with whole milk or any other non-filled milk product. Yet our statutes indicate that any confusion, deception, fraud or substitution is avoided when the package is "plainly labeled as 'oleomargarine' or 'margarine.'" K.S.A. 65–639. Again the legislature appears to have recognized the native intelligence of the Kansas consumer when it allowed the sale of ice milk (K.S.A. 65–720) and frozen dairy desserts (K.S.A. 65–720a and b) so long as properly noticed or labeled.

*Id.* at 600–601, 659 P.2d 785.

The Court then pointed out an example of the irrationality of the FDPA:

One of the most obvious examples that comes to any coffee drinker's mind is the small individual serving of "cream" found in nearly every restaurant. Two of the popular brands in the Topeka area are Meyer's Half & Half, a dairy product, and Royal Danish Coffee Creamer, a non-dairy product. Coffee Creamer is sold in obvious competition with other dairy products such as Meyer's Half & Half and is intended as a substitute or replacement for the real dairy product. Coffee Creamer, however, is legal as it has no milk products among its ingredients, yet

if the real thing, any milk product however slight, is added to the Coffee Creamer it becomes illegal under K.S.A. 65–727(b). The result is totally ridiculous and bears absolutely no reasonable relationship to the objectives set forth by the legislature in 65–726. Likewise, the ban of Imitation, which is clearly labeled and not misleading, because it contains some amount of milk by-products when presumably it would be legal if it did not, is an unreasonable classification which will not pass constitutional muster.

*Id.* at 601–601, 659 P.2d 785.

The Court concluded:

All that has been said in this opinion and the authorities cited and quoted about various filled milk statutes applies equally to our filled dairy products act which goes even further than the early statutes and singles out specific types of products for special treatment.

Inasmuch as the issue before us is limited to a determination of whether K.S.A. 65–727(b) is unconstitutional as to the product Imitation, we make no determination at this time as to the unconstitutionality of the Act in toto. We have no hesitancy in finding that K.S.A. 65–727(b) as applied to Imitation is an unconstitutional violation of plaintiff's right to due process and the equal protection of the law

*Id.* at 604, 659 P.2d 785.

█ We shall follow the lead of the Kansas Supreme Court. In *Strehlow,* the Court noted the great number of cases which have dealt with the constitutionality of filled dairy laws. We will not repeat the discussion of those cases but would only note that, like the Kansas Supreme Court, we find those cases holding that filled dairy laws are unconstitutional persuasive in this case. All of the reasons stated by the *Strehlow* court for finding the FDPA unconstitutional as applied to the product in question there are equally applicable to the products in question here. Thus, for the reasons stated by the Kansas Supreme Court and based on the cases cited therein, we find that the FDPA violates the equal protection

and due process clauses of the fourteenth amendment.

Whatever purposes that the courts in the past found to justify the filled dairy laws are no longer viable today. Labeling laws, such as K.S.A. 65–665, obviate the need for such statutes as the FDPA. Problems of fraud and deception regarding filled dairy products are a thing of the past. As the court in *Milnot Co. v. Richardson,* 350 F.Supp. 221, 225 (1972) stated:

> The possibility of confusion, or passing off, in the marketplace, which justified the [Federal Filled Milk Act, 21 U.S.C. § 61 *et seq.*] in 1944, can no longer be used rationally as a constitutional prop to prevent interstate shipment of Milnot. There is at least as much danger with imitation milk as with filled milk, and actually no longer any such real danger with either.

Defendants did note one situation where labeling laws do not adequately protect the consumer from fraud and deception. Defendants asserted that plaintiff's products could be served in restaurants and institutional settings without notice to the customer that the products were not whipped cream. The court notes that the evidence showed that the plaintiff's products are not sold in the manner suggested by the defendants but, even if they were, we would find no merit to defendants' argument. We are in agreement with the comments of the court in *Coffee-Rich, Inc. v. Commissioner of Public Health, supra,* 204 N.E.2d at 288, which rejected the argument advanced by the defendants:

> The defendants contend, however, that the "reasonableness" of totally prohibiting the sale of Coffee-Rich to prevent "fraud, deception and confusion becomes abundantly clear from a consideration of the possible uses of this product." They argue that "[a]lthough * * * the . * * * product is at present sold only in retail markets * * *, there is no adequate means of preventing a common victualer or other institutional user from purchasing large quantities of 'Coffee-Rich' and selling it under the guise of cream." But whatever the consequences of such possible fraudulent action, they need not be

visited on the manufacturer who makes a wholesome product and in no way misleads any reasonable person as to its nature. The defendants' reasoning, if upheld, would sanction an embargo on the sale of plainly labeled horsemeat, for example, on the ground that institutional users might buy it and serve it in the guise of beef. Similarly, the sale of harmless artificial sweeteners could be prohibited on the ground that restaurateurs who purchase them might fraudulently substitute them for sugar in food and drink which they prepare for customers.... [A] less arbitrary approach to protect consumers from fraud and confusion, and a particularly obvious one, would be to penalize those who actually practice the deception rather than the guiltless producer or distributors of Coffee-Rich and, indirectly, those consumers who want to purchase the product precisely because it is a nondairy product.

In sum, we are in agreement with the Kansas Supreme Court that the Kansas consumer is able to intelligently identify the product he is purchasing and assess its value and make nutritional distinctions when the label clearly discloses the ingredients of the product and its nutritional value.

The irrationality of the FDPA is demonstrated by the very facts of this case. Cool-Whip, a non-dairy whipped topping, which closely resembles whipped cream, is legal in Kansas because it contains no dairy products. Dover Farms and Cool-Whip with real cream, whipped toppings which also closely resemble whipped cream, are illegal in Kansas because they contain dairy products. This result is absurd and bears absolutely no reasonable relationship to the objectives set forth by the legislature in K.S.A. 65–726.

In light of the court's finding that the FDPA violates the equal protection and due process clauses of the fourteenth amendment, we find it unnecessary to consider the other arguments made by the plaintiff. It is also unnecessary to consider plaintiff's motion to amend its complaint in which it sought to add its argument on the vague-

ness of the FDPA. The court finds the plaintiff has failed to establish the existence of conspiracy pursuant to 42 U.S.C. § 1985(3). Further, since plaintiff has failed to establish a conspiracy under § 1985, then its claim under 42 U.S.C. § 1986 must also fail. *Hahn v. Sargent*, 388 F.Supp. 445 (D.Mass.1975), *aff'd*, 523 F.2d 461 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The court notes that plaintiff's claim under § 1985(3) suffers from several problems but we find it unnecessary to engage in a discussion of these problems because plaintiff may obtain its desired relief under § 1983.

Finally, we shall examine defendants' contentions of immunity under the eleventh amendment. Defendants argue that they are entitled to immunity under the eleventh amendment. Plaintiff contends that the eleventh amendment neither bars the instant suit nor the relief sought.

The law on this issue is summarized in *Florida Department of State v. Treasure Salvors, Inc.*, —— U.S. ——, ——, 102 S.Ct. 3304, 3314–15, 73 L.Ed.2d 1057 (1982):

> A suit generally may not be maintained directly against the State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity. *Alabama v. Pugh*, 438 U.S. 781 [98 S.Ct. 3057, 57 L.Ed.2d 1114]. If the State is named directly in the complaint and has not consented to the suit, it must be dismissed from the action. *Id.*, at 782 [98 S.Ct. at 3058].
>
> . . . .
>
> The Eleventh Amendment does not bar all claims against officers of the State, even when directed to actions taken in their official capacity and defended by the most senior legal officers in the executive branch of the state government. In *Ex parte Young*, 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714], the Court held that an action brought against a state official to enjoin the enforcement of an unconstitutional state statute is not a suit against a State barred by the Eleventh Amendment. In response to the argument that the official in such a case could act only

as an officer of the State and that the suit therefore could be characterized only as an action against the State itself, the Court explained:

> > The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce is a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Id.*, at 160 [28 S.Ct. at 454].

> There is a well-recognized irony in *Ex parte Young;* unconstitutional conduct by a state officer may be "state action" for purposes of the Fourteenth Amendment yet not attributable to the State for purposes of the Eleventh. Nevertheless, the rule of *Ex parte Young* is one of the cornerstones of the Court's Eleventh Amendment jurisprudence. See *Edelman v. Jordan*, 415 U.S. 651, 663–664 [94 S.Ct. 1347, 1356–1357, 39 L.Ed.2d 662]; *Quern v. Jordan*, 440 U.S. 332, 337 [99 S.Ct. 1139, 1143, 59 L.Ed.2d 358].

*Also see Patsy v. Florida Board of Regents*, 457 U.S. 496, 530–31 n. 17, 102 S.Ct. 2557, 2576 n. 17, 73 L.Ed.2d 172 (1982) (Powell, J., dissenting).

■ As recognized in *Treasure Salvors,* absent waiver by the State of Kansas of sovereign immunity, the instant action

against the Kansas State Board of Agriculture is barred by the eleventh amendment. The court finds no such waiver and thus this defendant shall be dismissed from the case. Plaintiff's claims against the individual state officials are not barred by the eleventh amendment because plaintiff has contended that the actions of these state officials are unconstitutional.

■ One contention for dismissal of defendant Priddle was made by counsel for the defendants as an eleventh amendment argument. As indicated above, defendants' counsel's reliance on the eleventh amendment is misplaced. However, the argument asserted is meritorious and requires dismissal of defendant Priddle. Counsel for the defendants had argued that defendant Priddle should be dismissed because he has no connection with the administration and enforcement of the FDPA. Indeed, K.S.A. 65–730 provides that the Dairy Commissioner in Kansas is directed to administer and supervise the enforcement of the FDPA. The evidence failed to show any involvement in the administration or supervision of the FDPA by defendant Priddle and thus he shall be dismissed from this action.

To summarize, the court finds that plaintiff's new products are subject to the provisions of the FDPA. The court further finds that the FDPA is unconstitutional as a violation of the equal protection and due process clauses of the fourteenth amendment and therefore the plaintiff is entitled to relief under 42 U.S.C. § 1983. Defendants Kansas State Board of Agriculture and Harland Priddle are dismissed from this action for the reasons set forth in this opinion. Defendant Rowley is entitled to judgment on plaintiff's claims under 42 U.S.C. §§ 1985 and 1986.

IT IS THEREFORE ORDERED that the Kansas filled dairy products act, K.S.A. 65–725 *et seq.,* is declared in violation of the equal protection and due process clauses of the fourteenth amendment of the United States Constitution. Judgment, pursuant to 42 U.S.C. § 1983, shall therefore be entered for the plaintiff in this case. Defendant Brace Rowley is hereby permanently enjoined from enforcing or attempting to enforce the Kansas filled dairy products act.

IT IS FURTHER ORDERED that defendants Kansas State Board of Agriculture and Harland Priddle be dismissed from this action.

IT IS FURTHER ORDERED that judgment be entered for defendant Rowley on plaintiff claims under 42 U.S.C. §§ 1985 and 1986.

IT IS SO ORDERED.